**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0907n.06
Filed: December 20, 2006

**No. 05-4258**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **HUSAM JAADAN,** | ) | |
| | ) | ON PETITION FOR REVIEW |
| *Petitioner,* | ) | OF AN ORDER OF THE |
| | ) | BOARD OF IMMIGRATION |
| v. | ) | APPEALS |
| | ) | |
| **ALBERTO R. GONZALES,** Attorney General, | ) | **O P I N I O N** |
| | ) | |
| *Respondent.* | ) | |
| | ) | |

**BEFORE:** **COLE, McKEAGUE, Circuit Judges; BREEN, District Judge.***

**R. GUY COLE, JR., Circuit Judge.** Petitioner Husam Jaadan seeks review of an immigration judge's ("IJ") decision, affirmed without opinion by the Board of Immigration Appeals (BIA), ordering that Jaadan be deported to Iraq based on his convictions for two crimes involving moral turpitude. Jaadan contends that (1) there is insufficient record evidence to show that he was convicted of crimes involving moral turpitude; (2) he is entitled to relief, such as asylum and withholding of removal, because his felonious-assault conviction was not, as the IJ concluded, a "particularly serious crime," which would otherwise preclude those forms of relief; (3) the IJ's failure to conduct a competency hearing violated his due-process rights; (4) the BIA's summary affirmance without opinion violated his due-process rights; and (5) deporting him to Iraq amounts

_____

*The Honorable J. Daniel Breen, United States District Judge for the Western District of Tennessee, sitting by designation.

to refoulement (return of a refugee) that violates the 1967 United Nations Protocol Relating to the Status of Refugees. For the reasons discussed below, Jaadan's arguments are without merit. We therefore **DENY** his petition.

## I. BACKGROUND

### A. Facts

Jaadan is a native and citizen of Iraq who was admitted to the United States as an immigrant in November 1976. Jaadan was convicted in Michigan in July 1982 of breaking and entering an occupied dwelling with intent to commit larceny. In December 1993, Jaadan was convicted in Michigan of felonious assault. This conviction was evidently the result of an incident involving Jaadan's sister, in which Jaadan allegedly threatened and assaulted her with a knife. As a result of this crime, Jaadan was subsequently found to be a habitual offender under Michigan law and was resentenced in March 1994.

### B. Deportation Proceedings

#### 1. Initial Proceedings

As a result of Jaadan's convictions, on September 6, 1994, the Immigration and Naturalization Service (INS) (now part of the Department of Homeland Security) commenced deportation proceedings against Jaadan. The INS issued a Show Cause Order charging Jaadan with being deportable under former section 241(a)(2)(A)(ii) of the Immigration and Nationality Act (INA)[1] for having been convicted of two crimes involving moral turpitude.

On April 23, 1997, the IJ concluded that Jaadan was deportable on this basis. Jaadan pursued

---

[1]8 U.S.C. § 1251(a)(2)(A)(ii) (1994); now codified at 8 U.S.C. § 1227(a)(2)(A)(ii).

applications for asylum, withholding of deportation, and voluntary departure under the INA. Additionally, Jaadan requested leave to file for a waiver of deportation under former section 212(c) of the INA, which was available to permanent residents who had been domiciled in the United States for seven consecutive years.

The IJ denied Jaadan's application for asylum and withholding of deportation because his felonious-assault conviction amounted to a "particularly serious crime." The IJ denied his request for leave to file for a section 212(c) waiver because the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (1996) (AEDPA), made section 212(c) unavailable to aliens deemed deportable for offenses, such as Jaadan's, covered in section 241(a)(2)(A)(ii).

Jaadan appealed the IJ's decision to the BIA. On October 26, 2001, the BIA issued an order remanding Jaadan's case to the IJ for further proceedings. Although the BIA agreed that the IJ properly sustained the charge of deportability, the BIA remanded the case so that (1) Jaadan could apply for relief under section 212(c) of the INA (because the AEDPA's amendments restricting that section are not retroactive); (2) the IJ could decide whether Jaadan had been convicted of a "particularly serious crime" based on an individual examination of the felonious-assault conviction; and (3) Jaadan could apply for waiver of deportation under section 212(h) of the INA as the son of a United States citizen, should he be able to show he was otherwise eligible for adjustment of status.

2.     Remand Proceedings

On June 7, 2004, on remand, the IJ issued a second order denying Jaadan's applications for relief and ordering him deported from the United States to Iraq. The IJ explained that (1) Jaadan refused to testify regarding his request for section 212(c) relief; (2) the circumstances of the

felonious-assault conviction showed that it was a "particularly serious crime"; and (3) Jaadan failed

to file an application for waiver of excludability under section 212(h). Further, the IJ addressed

Jaadan's competency, as Jaadan was uncommunicative and exhibited signs of mental illness. The

IJ suggested that Jaadan's mother consider committing Jaadan to a mental-health facility. The IJ also

explained that although Jaadan was "given numerous opportunities to obtain information, seek

counseling or present evidence of his [in]competency," he failed to do so. (Joint Appendix ("JA")

23.) Concluding that Jaadan could not "avoid the consequences of his actions and his criminal

activities by refusing to testify," the IJ denied Jaadan's further requests for relief "due to his failure

to prosecute his own applications." (*Id.* 24.)

Jaadan again appealed to the BIA. On September 14, 2005, the BIA issued an order

affirming the IJ's decision without opinion. Jaadan then filed the instant petition for review.

## II. DISCUSSION

### A. Statutory Framework and Standard of Review

1.      Statutory Framework

If an admitted alien is convicted of two or more crimes involving moral turpitude not arising

out of a single scheme of criminal conduct, the alien is deportable. INA § 241(a)(2)(A)(ii), 8 U.S.C.

§ 1251(a)(2)(A)(ii) (1994). An alien is not deportable "unless it is found by clear, unequivocal and

convincing evidence that the facts alleged as grounds for deportation are true." 8 C.F.R. § 242.14(a)

(1994); *accord* INA § 240(c)(3)(A), 8 U.S.C. § 1229a(c)(3)(A).

An alien may seek relief from deportation by filing an application for asylum and withholding

of deportation under the INA. *See* INA §§ 208(a), 243(h)(1); 8 U.S.C. §§ 1158(a), 1253(h)(1)

(1994).[2]   At all times relevant to his deportation proceedings, an alien bears the burden of establishing his eligibility for relief.  *See* 8 C.F.R. § 242.17(c)(4)(iii), (e) (1994).  An alien is expressly barred, however, from establishing his eligibility for asylum and withholding of deportation if the Attorney General, in his discretion, determines that the alien has been convicted of a "particularly serious crime" and therefore constitutes a danger to the community.  *See* INA § 243(h)(2)(b), 8 U.S.C. § 1253(h)(2)(b) (1994).

In 1996, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, 11 Stat. 3009-546 (1996), revamped the INA.  *Yousefi v. INS*, 260 F.3d 318, 322 n.1 (4th Cir. 2001).  The IIRIRA contains transitional rules for judicial review that apply to aliens, such as Jaadan, who were involved in deportation proceedings before April 1, 1997, and were issued a final deportation order more than thirty days after September 30, 1996, the date the IIRIRA was enacted.  *Id.* at 323.  Under these transitional rules, many of the IIRIRA's new provisions do not apply; however, its provisions limiting judicial review of certain deportation decisions, including those based on convictions for crimes of moral turpitude, do apply to aliens such as Jaadan.  *See Robledo-Gonzalez v. Ashcroft*, 342 F.3d 667, 675 n.7 (7th Cir. 2003) (citing 8 U.S.C. § 1101 (statutory notes)).  Specifically, INA section 242(a)(2)(C) bars judicial review of final orders of deportation entered against criminal aliens, including those who, like Jaadan, have been found deportable for multiple convictions for crimes involving moral turpitude.  *See* 8 U.S.C. § 1252(a)(2)(C).  *See also, e.g., Beltran v. INS*, 332 F.3d 407, 410-11 & n.2 (6th Cir. 2003).

Notwithstanding this bar on judicial review of Jaadan's deportation order, the Court retains

---

[2]Now codified at U.S.C. §§ 1158(a)(1) and 1231(b)(3)(A).

jurisdiction to determine whether jurisdiction exists. *See, e.g., Sosa-Martinez v. U.S. Att'y Gen.*, 420 F.3d 1338, 1340 (11th Cir. 2005). In other words, the Court retains jurisdiction to assess whether Jaadan's criminal convictions indeed constitute deportable offenses, but if the Court determines that they do, it has no jurisdiction to review whether Jaadan should be deported on that basis. *See id.* at 1341 ("If we determine that [the underlying crime] is a crime of moral turpitude, § 242(a)(2)(C) strips us of jurisdiction to review the final order of removal.") (citation omitted). In addition, the Court retains jurisdiction over "constitutional questions or questions of law" raised in the petition for review. *See* INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D) (2005).

2. Standard of Review

Where, as here, the BIA affirms the IJ's decision without issuing a separate opinion, the Court reviews the IJ's decision as the final agency determination. 8 C.F.R. § 1103.1(e)(4); *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003).

Whether a state-court conviction constitutes a crime involving moral turpitude is a legal question subject to de novo review. *E.g., Cuevas-Gaspar v. Gonzales*, 430 F.3d 1013, 1017 (9th Cir. 2005).

The Court's review of constitutional questions and questions of law is also de novo. *E.g., Hamama v. INS*, 78 F.3d 233, 239 (6th Cir. 1996).

**B. Merits**

1. The Record Evidence Shows Jaadan's Prior Crimes Involved Moral Turpitude, So He Is Deportable.

Jaadan challenges the IJ's determination that his two prior convictions were for crimes of

moral turpitude and therefore make him deportable. "Moral turpitude is a nebulous concept [that] refers generally to conduct that shocks the public conscience as being inherently base, vile, or depraved, contrary to the rules of morality and the duties owed between [people] . . . ." *In re Short*, 20 I. & N. Dec. 136, 137 (BIA 1989).

To determine whether a crime falls within a particular category of grounds for deportation (in this case, whether the crimes involve moral turpitude), the Court should first employ the "categorical" approach. *Cuevas-Gaspar*, 430 F.3d at 1017. Under the categorical approach, the Court considers not whether the actual conduct constitutes a crime involving moral turpitude, but "whether the full range of conduct encompassed by the statute constitutes a crime of moral turpitude." *Id.* (citation omitted). If so, the conviction is necessarily for a crime involving moral turpitude. *See In re Short*, 20 I. & N. at 137 ("If [the statute] defines a crime in which turpitude necessarily inheres, then the conviction is for a crime involving moral turpitude for the purposes of the deportation statute.")

If, however, the statute of conviction criminalizes some conduct that does not involve moral turpitude, the Court should apply the modified categorical approach. *See Cuevas-Gaspar,* 430 F.3d at 1020. Under this approach, the Court conducts a limited examination of documents in the record to determine whether the particular offense at issue constitutes a crime involving moral turpitude. *Id*. This inquiry does not involve looking to the particular facts underlying the conviction; rather, it is limited to judicial documents that are part of the record of conviction, such as the judgment of conviction, charging documents, written plea agreement, and transcript of the plea colloquy. *Id.* (citing *Shepard v. United States,* 544 U.S. 13 (2005)); *In re Short*, 20 I. & N. Dec. at 137 ("Only

where the statute under which the respondent was convicted includes some offenses [that] involve moral turpitude and some [that] do not do we look to the record of conviction, meaning the indictment, plea, verdict, and sentence, to determine the offense for which the respondent was convicted.") (citations omitted). As discussed below, both of Jaadan's underlying convictions are for crimes involving moral turpitude.

### a. Breaking and Entering

Jaadan's first conviction was for breaking and entering in violation of Michigan law. The applicable statute provided that "[a]ny person who breaks and enters any occupied dwelling house, with intent to commit any felony or larceny therein, shall be guilty of a felony . . . ." Mich. Comp. Laws § 750.110 (1970). The Government concedes that this statute prohibits a broad range of conduct, some of which does not categorically qualify as a crime involving moral turpitude under the INA. The Court therefore should apply the modified categorical approach to determine whether the record evidence clearly establishes that Jaadan's conviction under section 750.110 constitutes a crime involving moral turpitude. *Cf. Cuevas-Gaspar,* 430 F.3d at 1020.

Jaadan does not dispute that generally a conviction for breaking and entering with the intent to commit larceny is a crime involving moral turpitude. *See, e.g., id.* at 1020 ("Because the underlying crime of theft or larceny is a crime of moral turpitude, unlawfully entering a residence with intent to commit theft or larceny therein is likewise a crime involving moral turpitude."); *In re M-*, 2 I. & N. Dec. 721, 723 (AG 1946) ("[I]f the crime accompanying the breaking and entering is larceny, then this violation . . . would involve moral turpitude, since larceny is an offense [that] has been universally held to involve such conduct."). Jaaden contends, however, that the record is

insufficient to establish that his crime involved an intent to commit larceny; accordingly, he argues, the crime cannot be shown to involve moral turpitude. He points out that the "Articles of Probation" document states that Jaadan was "convicted . . . of the crime of breaking and entering ([an] occupied dwelling house)" but does not specifically include language indicating an intent to commit larceny.

Jaadan ignores, however, many documents in the record showing that he was convicted of breaking and entering an occupied dwelling house "with the intent to commit the crime of larceny therein." (*See, e.g.,* Criminal Complaint, JA 90; Habitual Offender Information, JA 83; Circuit Court General Information, JA 87.) This evidence suffices to establish that Jaadan's conviction under section 750.110 involved an intent to commit larceny. *Cf. Cuevas-Gaspar*, 430 F.3d at 1020 ("[B]ecause [petitioner] admitted in his guilty plea to entering a residence with the intent to steal property from the residence, his conviction constitutes a crime involving moral turpitude under the modified categorical approach.").

Additionally, Jaadan points out that the INS's Show Cause Order described his breaking-and-entering conviction under section 750.110 as a violation of "MCL 750.110-*B*," (JA 227) (emphasis added), which he argues is confusing because Mich. Comp. Laws § 750.110b—in contrast to Mich. Comp. Laws § 750.110—does not involve breaking and entering; rather, it prohibits dumping garbage from boats. But whatever confusion exists here does not provide him relief. In the Michigan statute, section 750.110 is the basic provision prohibiting breaking and entering. Section 750.110a provides definitions and penalties under section 750.110. Section 750.110b, dealing with dumping from boats, was apparently intended to follow section 109a (which regulates mooring of boats), not section 110. *See* Mich. Comp. Laws Serv. § 750.110b (2006) (Editor's note). It is not

clear why the Show Cause Order refers to the applicable statute as "MCL 750.110-B" when Jaadan was convicted of violating section 750.110. But there is no confusion that Jaadan was convicted of violating section 750.110 for breaking and entering: The Show Cause Order itself refers to his conviction "for the offense of breaking and entering," (JA 227), and the other conviction documents refer to the same conviction as a violation of "750.110." (*See, e.g.,* Criminal Complaint, JA 90 (referring to "breaking and entering of an occupied dwelling with intent to commit larceny" as "[c]ontrary to Sec. 750.110"); Circuit Court General Information, JA 87 (same).) Jaadan himself admits as much: "Certainly, logic dictates that the seventeen-year-old Jaadan was not dumping from a boat, and that what he was accused of was breaking and entering an occupied dwelling house with the intent to commit the crime of larceny therein." (Pet'r Br. 7.) Accordingly, Jaadan's typographical concerns regarding the Show Cause Order do not affect the IJ's proper conclusion that he was convicted of a crime involving moral turpitude.

### b. Felonious Assault

Jaadan does not challenge the BIA's conclusion in its decision remanding matters to the IJ that felonious assault under Mich. Comp. Laws § 750.82 is also a crime involving moral turpitude. Section 750.82 makes it a felony to assault someone with a weapon.[3] As the BIA noted, assaults

---

[3]The statute provides as follows:

> FELONIOUS ASSAULT—Any person who shall assault another with a gun, revolver, pistol, knife, iron bar, club, brass knuckles or other dangerous weapon, but without intending to commit the crime of murder, and without intending to inflict great bodily harm less than the crime of murder, shall be guilty of a felony.

Mich. Comp. Laws § 750.82 (1970).

involving the use of a weapon are crimes of moral turpitude. (JA 109 (citing *In re Medina*, 15 I. & N. Dec. 611 (BIA 1976), *aff'd sub nom. Medina-Luna v. INS*, 547 F.2d 1171 (7th Cir. 1977)).) *See also Sosa-Martinez,* 420 F.3d at 1342 (citing various courts-of-appeals cases concluding that assault with a dangerous or deadly weapon is a crime involving moral turpitude).

        Jaadan contends, however, that "it is impossible to tell whether he was convicted of felonious assault" under Mich. Comp. Laws § 750.82 because the record contains documentation suggesting that his conviction for that crime had been vacated. But that documentation refers to vacating his *sentence*, not his conviction, by virtue of Michigan's habitual-offender law. Jaadan does not contest that he was found to be a habitual offender under Mich. Comp. Laws §§ 769.10 and 769.13. Under that statute, once a person has been convicted of two felonies in the state, the court may sentence that person under the habitual-offender provisions and "shall *vacate the previous sentence . . . .*" Mich. Comp. Laws § 769.13 (1978) (emphasis added). *See also People v. Miller*, 394 N.W.2d 459, 461 (Mich. 1986) ("[Section] 769.13 clearly requires that the sentence for the underlying offense be vacated."). In short, "the merits of the underlying judgment have not been called into question and adverse legal consequences continue to follow from it." *In re Marroquin-Garcia*, 23 I. & N. Dec. 705, 714 (AG 2005).

        Jaadan also suggests that to the extent the habitual-offender law impacts him, it merely vacated his *assault-and-battery* sentence arising out of the same incident and did not affect his felonious-assault conviction or sentence. Under this theory, because there nonetheless is documentation that the felonious-assault conviction was "vacated," it must have been vacated on other grounds and should not serve as a basis for deportation. But assault and battery under

Michigan law is a misdemeanor, Mich. Comp. Laws § 750.81(a) (1970), and therefore cannot serve as the basis for finding a defendant to be a habitual offender. Mich. Comp. Laws § 769.10(1) (1978) (noting that a defendant must be convicted of a "subsequent *felony*" to be considered a habitual offender) (emphasis added). There is no valid basis to suggest that the references to "vacating" Jaadan's felonious-assault conviction have to do with anything but the vacating of the sentence for that crime under Michigan's habitual-offender law. Accordingly, the IJ properly determined that Jaadan was convicted of felonious assault under Mich. Comp. Laws § 750.82, a crime involving moral turpitude.

2.      <u>This Court Lacks Jurisdiction to Review Whether the IJ Properly Determined the Felonious Assault Was a "Particularly Serious" Crime, so Jaadan Is not Entitled to Asylum or Withholding of Deportation.</u>

Jaadan also argues that, even if deportable, he is entitled to asylum and withholding of deportation. Under 8 C.F.R. § 208.13(c)(2)(i)(A) and INA § 243(h)(2)(B), however, this relief is unavailable to aliens who, "having been convicted . . . of a particularly serious crime, constitute[] a danger to the community . . . ." The IJ concluded that Jaadan's felonious-assault conviction for striking his sister and threatening her with a knife amounted to a "particularly serious crime." (JA 20.)

This Court lacks jurisdiction to review the IJ's discretionary determination that the felonious assault involved a particularly serious crime. *See* INA § 242(a)(2)(B), 8 U.S.C. § 1252(a)(2)(B); *see also Almaghzar v. Gonzales*, 457 F.3d 915, 923 (9th Cir. 2006) ("We are without jurisdiction to review [petitioner's] claim that the IJ erred in concluding that [petitioner's] felony convictions constituted particularly serious crimes that bar him from withholding of removal."); *Afridi v.*

*Gonzales*, 442 F.3d 1212, 1218 (9th Cir. 2006) ("While we cannot reweigh evidence to determine if the crime was indeed particularly serious, we can determine whether the BIA applied the correct legal standard in making its determination.").

Jaadan contends that because his case arose before the IIRIRA and its jurisdiction-stripping provisions were enacted, they therefore do not apply here. But Jaadan admits that the IIRIRA's "'transitional rules' of judicial review" apply to his case. (Pet'r Br. 1.) As discussed above, these rules expressly provide that the jurisdiction-stripping provisions apply here. *See, e.g., Roman Robledo-Gonzalez v. Ashcroft*, 342 F.3d 667, 675 n.7 (7th Cir. 2003) (citing 8 U.S.C. § 1101 (statutory notes)).

Moreover, even if this Court had jurisdiction, the IJ, on remand, made an individualized determination that Jaadan's felonious-assault conviction amounted to a particularly serious crime, noting that Jaadan inflicted physical injury and that the crime involved potentially life-threatening acts. (JA 20.) This determination is consistent with this Court's prior decisions. *See Hamama*, 78 F.3d at 239-40 (affirming BIA decision that felonious-assault conviction under Mich. Comp. Laws § 750.82 was a particularly serious crime where petitioner "angrily waved a gun at another driver" and his conduct "involved 'the substantial risk of violence towards another person'").

3.      Jaadan Had No Right To a Competency Hearing.

Jaadan raises certain due-process challenges to his deportation proceedings that this Court may consider. *See* INA § 242(a)(2)(D), 8 U.S.C. § 1252(a)(2)(D) (noting that court of appeals can review alien's "constitutional claims or questions of law"). An alien in deportation proceedings is entitled to due process in the form of a "full and fair" hearing. *See, e.g., Ahmed v. Gonzales*, 398

F.3d 722, 725 (6th Cir. 2005). An alien must be given "a reasonable opportunity to examine the evidence against him, to present evidence on his own behalf, and to cross-examine witnesses presented by the Government." *Id.* at 725 (citation omitted). To constitute fundamental unfairness, a defect in the deportation proceedings "must have been such as might have led to a denial of justice." *Vasha v. Gonzales*, 410 F.3d 863, 872 (6th Cir. 2005) (citation omitted). Thus, "proof of prejudice is necessary to establish a due process violation in an immigration hearing." *Id.* (citation omitted).

Jaadan's first due-process argument is that his deportation proceedings were fundamentally unfair because the IJ failed to conduct a competency hearing even though Jaadan exhibited signs of mental illness. This argument fails because the Constitution forbids only *criminal* proceedings against one who is incompetent. *See, e.g., Godinez v. Moran*, 509 U.S. 389, 396 (1993) ("A criminal defendant may not be tried unless he is competent.") (citing *Pate v. Robinson*, 383 U.S. 375, 378 (1966)). But "immigration and deportation proceedings are civil, and not criminal, in nature." *Csekinek v. INS*, 391 F.3d 819, 824 (6th Cir. 2004). A deportation proceeding "is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry . . . ." *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984). Accordingly, "various protections that apply in the context of a criminal trial do not apply in a deportation hearing." *Id.*; *see also United States v. Mandycz,* 447 F.3d 951, 962 (6th Cir. 2006) (explaining that prohibition against trying incompetent criminal defendants does not apply to denaturalization proceeding).

The only time a competency hearing may be required in the immigration context is to determine whether an *unrepresented* alien shows sufficient evidence of incompetency to require an

attorney or guardian to represent the alien's interests at the proceedings. *See Mohamed v. Tebrake,*
371 F. Supp. 2d 1043 (D. Minn. 2005) (*cited in Mandycz*, 447 F.3d at 962) (holding that
unrepresented alien had due-process right to competency hearing to determine whether representative
should be appointed under 8 C.F.R § 1240.4, which provides that an attorney or other representative
should be appointed "[w]hen it is impracticable for the respondent to be present at the hearing
because of mental incompetency"). Here, Jaadan was represented by counsel in the deportation
proceedings, and the IJ considered the applicability of immigration regulations regarding
competency. (JA 23 (noting that 8 C.F.R. § 1240.43 (the precursor to § 1240.4) "addresses the
impracticability for a respondent to be present due to issues of mental incompetency")). In short,
Jaadan's due-process competency rights are limited to a determination of whether his incompetency
requires that he have a representative at his deportation proceedings, not whether his incompetency
precludes deportation altogether. Because Jaadan had counsel, he had all he was entitled to.[4]

Additionally, as the Government points out, the IJ—notwithstanding the lack of a
constitutional obligation in this regard—considered Jaadan's competency and concluded that Jaadan
failed to establish that he could not understand or appreciate the nature of his deportation
proceedings. (JA 22, 23.) Further, Jaadan cannot show that the IJ's failure to conduct a competency
hearing prejudiced him. Not only would Jaadan likely fail to establish incompetency (for the reasons
just discussed), but, even if he did, he could still be deported. *See Mohamed*, 371 F. Supp. 2d at

---

[4]Jaadan does not raise arguments regarding the IJ's denial of his requests for relief under INA
sections 212(c) or 212(h), other than implying that the IJ failed to properly account for his
competency when making these determinations. (*See, e.g.,* Pet'r Br. 25 (noting that Jaadan's
competency is at issue in light of his failure to testify regarding his section 212(c) application).)
Because his competency argument is without merit, contentions depending on it also fail.

1046 ("[T]he law specifically contemplates that removal proceedings may go forward against incompetent aliens and that incompetent aliens may be deported.") (citing *Nee Hao Wong v. INS*, 550 F.2d 521, 523 (9th Cir. 1977)).[5]

      4.     <u>The BIA's Summary Decision Did Not Violate Jaadan's Due-Process Rights</u>

Jaadan also argues that the BIA's decision affirming the IJ decision without opinion amounts to a denial of due process. But we have determined that these summary BIA decisions do not violate due process. *Denko v. INS*, 351 F.3d 717, 729 (6th Cir. 2003) (Petitioner's "argument that the summary affirmance without opinion permitted by § 1003.1(a)(7) violates the mandate that agencies must set forth reasons for their decisions . . . fails because the IJ's opinion becomes the reasoned explanation needed for review.") (citing *Albathani v. INS*, 318 F.3d 365, 378-79 (1st Cir. 2003)).

      5.     <u>The U.N. Protocol Preventing Refoulement Provides Jaadan no Greater Rights than the INA.</u>

Jaadan's last argument appears to be that deporting him to Iraq amounts to refoulement—the expulsion or return of a refugee from one state to another—in violation of the 1967 United Nations Protocol Relating to the Status of Refugees. Jaadan notes that the United States is a party to this Protocol, which incorporates Articles 2 through 34 of the 1951 Convention Relating to the Status of Refugees, which in turn provides that "[n]o contracting state shall expel or return (refouler) a refugee in any manner whatsoever to the frontiers or territories where his life or freedom would be threatened on account of his . . . political opinion." (Pet'r Br. 49 (citing Convention Relating to the

---

[5]Jaadan also argues that his alleged incompetency invalidates his guilty pleas to the underlying criminal offenses that served as the basis of deportation. (Pet'r Br. 27.) Even if Jaadan provided sufficient evidence of incompetency here, he provides no authority under which this Court can question the validity of those pleas.

Status of Refugees, art. 33, ¶ 1, 198 U.N.T.S. 150, 176 (July 28, 1951)).) Jaadan states that "[t]he law involved in that concept is discussed in *Haitian Refugee Center, Inc. v. Baker*, 789 F. Supp. 1552 [(S.D. Fla. 1991)]." (Pet'r Br. 49.)

Jaadan is not entitled to relief under the U.N. Protocol. The district court in *Haitian Refugee Center* did indeed grant a preliminary injunction to Haitian refugees based on a determination that the Protocol was self-executing and therefore needed no congressional action for the plaintiffs to avail themselves of it. 789 F. Supp. at 1559. But Jaadan fails to alert this Court that the Eleventh Circuit *reversed* that decision on that very point, holding that the Protocol is not self-executing and therefore provides no enforceable rights without legislation. *See Haitian Refugee Ctr. v. Baker*, 949 F.2d 1109, 1110 (11th Cir. 1991) ("The language of the Protocol and the history of the United States' accession to it leads to the conclusion that Article 33 is not self-executing and thus provides no enforceable rights to the Haitian plaintiffs in this case.") (citation omitted). This view has been consistently followed. *See, e.g., Barapind v. Reno*, 225 F.3d 1100, 1107 (9th Cir. 2000) ("[T]he Protocol was not intended to be self-executing, and serves only as a useful guide in determining congressional intent in enacting the Refugee Act.").

As explained in more detail by the district court in *Barapind*, Congress amended the immigration law in 1980 to reflect the Protocol's directives. *Barapind v. Reno*, 72 F. Supp. 2d 1132, 1149 (E.D. Cal. 1999) (citing *INS v. Doherty*, 502 U.S. 314, 331 (1992) (explaining that United States law was amended to conform to Article 33, so "the nondiscretionary duty imposed by 8 U.S.C. § 243(h) [withholding of deportation] parallels the United States' mandatory non-refoulement obligations under Article 33.1")). The court further explained that the Protocol does not "confer any

rights beyond those granted by implementing domestic legislation." *Id.* (citing, among other cases,

*Haitian Refugee Ctr.*, 949 F.3d at 1110). Ultimately, the court concluded that the Protocol "affords

petitioner no rights beyond the INA and its amendments." *Id.* Likewise, because Jaadan has no right

to relief under the INA, he has no right to relief under the Protocol.

## III. CONCLUSION

For the foregoing reasons, we **DENY** Jaadan's petition for review.